UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN ELLENBURG,<br><br>Plaintiff,<br><br>v.<br><br>PODS ENTERPRISES, LLC,<br><br>Defendant. | No. 2:18-cv-02179-KJM-CKD<br><br><br><br>ORDER |

Defendant POD Enterprises, LLC moves for partial summary judgment, raising a narrow question of statutory construction. *See* Mot. Summary Judgment ("MSJ"), ECF No. 11-1. Generally, under the Federal Aviation Administration Authorization Act ("FAAAA"), federal law preempts any state law "having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor carrier, broker, or freight forwarder with respect to transportation of property." 49 U.S.C. § 14501(c)(1). However, as pertinent here, this preemptive effect "does not apply to the intrastate transportation of household goods." *Id.* § 14501(c)(2)(B). Defendant takes the position the preemptive force of the FAAAA applies to certain components of plaintiff Kristin Ellenburg's complaint based in California law. *See generally* MSJ; Reply, ECF No. 18. Plaintiff, however, argues § 14501(c)(2)(B)'s exception applies to her claims, thus requiring denial of summary judgment. *See* Opp'n, ECF No. 12. The narrow question here involves application of the term "household goods motor carrier," as

defined in the statute under § 13102(12), and how that term affects the preclusive force of § 14501(c)(1). The parties agree defendant is not covered by the definition of "household goods motor carrier," but disagree as to how that affects § 14501(c)(1)'s preclusive effect. *See generally* Opp'n; Reply. As set forth below, the court finds § 14501(c)(1) does preclude plaintiff's four causes of action brought under California Business and Professions Code section 17200 and California Civil Code section 1750, and GRANTS defendant's motion for partial summary judgment.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Defendant rents and transports mobile self-service storage containers. Stipulated Fact ("SF") No. 5, ECF No. 11-3, 12-1. Customers can use defendant's storage containers to temporarily store their personal belongings, or they may have the containers transported for either storage or moving purposes, or both. SF No. 6. Defendant is not responsible for loading or unloading the containers. SF No. 7. Because defendant provides "self-service" containers, its customers, or a third party hired by its customers, are entirely responsible for loading and unloading a container's contents. SF No. 8.

Defendant holds interstate property motor carrier and broker authority and has been assigned a motor carrier number of 530785 and United States Department of Transportation number 1397252. SF No. 2. Defendant also holds California intrastate property motor carrier authority and has been assigned California motor carrier number 0491745. SF No. 3. At no time relevant to these proceedings was defendant licensed as a household goods carrier by the California Public Utilities Commission. SF No. 4.

On June 1, 2016, plaintiff placed an order through defendant's website to rent a self-service storage container. SF No. 9. Her initial order was for a 12-foot container, priced at $199.99 plus tax per month, but, on June 17, 2016, plaintiff changed her order to a 16-foot container, priced at $209.99 plus tax per month. SF No. 10. On or about June 17, 2016, defendant delivered the 16-foot container to plaintiff's home in El Dorado Hills, California. SF No. 11. Once delivered, plaintiff loaded the container with her personal property. SF No. 12. Defendant did not participate in any way with the loading of plaintiff's property into the

1  container. SF Nos. 13–15. Once the container was loaded, plaintiff arranged for defendant to
2  pick up the container on September 1, 2016. SF No. 16. When defendant retrieved the container,
3  it was locked with a lock owned by plaintiff for which defendant did not possess a key. SF No.
4  17. Plaintiff was charged $4.84 for the initial drop off and pick up of the container. SF No. 18.
5  After defendant retrieved the container, it took the container to a Sacramento-area warehouse for
6  storage. SF No. 19.
7        On November 2, 2017, plaintiff requested defendant transport the container from
8  its Sacramento warehouse to an address in Ripon, California. SF No. 21. Defendant informed
9  plaintiff this task required an additional relocation fee because the container first had to be
10 transported to defendant's warehouse in Manteca, California, before it could be delivered to the
11 Ripon address; Ripon is beyond the geographic service area of the Sacramento warehouse. SF
12 No. 22. On November 15, 2017, defendant transported the container from the Sacramento
13 warehouse to the Manteca warehouse; plaintiff was charged $231.88 for this transfer. SF Nos.
14 23–24. Then, on November 17, 2017, defendant transported the loaded container from the
15 Manteca warehouse to plaintiff's home in Ripon; plaintiff was charged $140.08 for this final
16 transfer. SF Nos. 25, 27. Once the container was delivered, plaintiff unloaded her property from
17 the container. SF No. 28. On November 29, 2017, defendant retrieved the empty container from
18 plaintiff's Ripon residence; the retrieval fee was included in the $140.08 fee previously charged.
19 SF No. 32–33. At no point throughout this process did defendant access the contents of the
20 container, nor did defendant assist with loading or unloading of the container's contents. SF Nos.
21 13–15, 26, 28–31.
22       On March 12, 2018, plaintiff initiated this putative class action in Sacramento
23 County Superior Court, alleging violations of California Business and Professions Code section
24 17200 for unlawful, unfair and fraudulent business practices, and violation of California Civil
25 Code section 1750. Compl., ECF No. 1-1. On August 8, 2018, defendant timely removed the
26 matter to this court under the Class Action Fairness Act ("CAFA") of 2005, 28 U.S.C. § 1332(d).
27 Not. of Removal, ECF No. 1. On February 1, 2019, defendant filed the pending partial summary
28 judgment motion based on federal preemption with respect to the transportation fee component of

1   plaintiff's claims.  MSJ.  On May 17, 2019, the court heard oral argument on the motion.  ECF
2   No. 19.  The court resolves the motion here.

3   II.     LEGAL STANDARD

4           A court will grant summary judgment "if . . . there is no genuine dispute as to any
5   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
6   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be
7   resolved only by a finder of fact because they may reasonably be resolved in favor of either
8   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

9           The moving party bears the initial burden of showing the district court "there is an
10  absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.
11  317, 325 (1986).  Then the burden shifts to the non-movant to show "there is a genuine issue of
12  material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).
13  In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . .
14  .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute,
15  or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.
16  56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more than simply
17  show that there is some metaphysical doubt as to the material facts").  Also, "[o]nly disputes over
18  facts that might affect the outcome of the suit under the governing law will properly preclude the
19  entry of summary judgment."  *Anderson*, 477 U.S. at 247-48.

20          In deciding summary judgment, the court draws all inferences and views all
21  evidence in the light most favorable to the non-movant.  *Matsushita*, 475 U.S. at 587-88.  "Where
22  the record taken as a whole could not lead a rational trier of fact to find for the [non-movant],
23  there is no 'genuine issue for trial.'"  *Id*. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.*
24  *Co.*, 391 U.S. 253, 289 (1968)).

25  III.    DISCUSSION

26          Because preemption and statutory construction are at the heart of defendant's
27  motion, the court first reviews its proper role when considering preemption in the context of the
28  relevant statutory text.

4

A.     Preemption Generally

The Constitution declares the laws of the United States "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  This provision, known as the Supremacy Clause, embodies the notion that, if federal and state law conflict, the former "preempts" the latter.  The common law has developed the ways in which preemption occurs.  First, it can occur through an express act of Congress.  *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision.").  Second, preemption can occur where Congress intends to occupy and govern a particular field or subject matter.  *Id.* ("States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.").  Finally, preemption occurs where state and federal laws conflict; "[t]his includes cases where compliance with both federal and state regulations is a physical impossibility, and . . . where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations and quotations omitted).  No matter "the type of preemption involved—express, field, or conflict—'[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis.'" *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (alteration in original) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

B.     Statutory Framework and Relevant History of the FAAAA

In *Rowe v. New Hampshire Motor Transp. Ass'n*, the Supreme Court explained the genesis of the FAAAA:

> In 1978, Congress "determin[ed] that 'maximum reliance on competitive market forces'" would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting 49 U.S.C.App. § 1302(a)(4) (1988 ed.)); *see* 92 Stat. 1705.  In order to "ensure that the States would not undo federal deregulation with regulation of their own," that Act "included a pre-emption provision" that said "no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier." *Morales*, supra, at 378, 112 S.Ct. 2031; 49 U.S.C.App. § 1305(a)(1) (1988 ed.).

5

> In 1980, Congress deregulated trucking. *See* Motor Carrier Act of 1980, 94 Stat. 793. And a little over a decade later, in 1994, Congress similarly sought to pre-empt state trucking regulation. *See* Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1605–1606; *see also* ICC Termination Act of 1995, 109 Stat. 899. In doing so, it borrowed language from the Airline Deregulation Act of 1978 and wrote into its 1994 law language that says: "[A] State ... may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1); see also § 41713(b)(4)(A) (similar provision for combined motor-air carriers).

552 U.S. 364, 367–68 (2008). As the Ninth Circuit later explained, Congress in enacting the FAAAA intentionally borrowed language from the Airline Deregulation Act ("ADA") because it "meant to create parity between freight services provided by air carriers and those provided by motor carriers." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 644 (9th Cir. 2014). Therefore, the Supreme Court's analysis in "*Morales* and other Airline Deregulation Act cases is instructive for our FAAAA analysis as well." *Id.*

In *Morales*, the Supreme Court considered whether certain air travel guidelines promulgated by the National Association of Attorneys General ("NAAG") and enforced through each state's individual consumer protection laws were preempted by § 1305(a)(1) of the ADA.[1] *Morales*, 504 U.S. at 378–80. In finding preemption, the Court focused on the phrase "relating to," also contained in the FAAAA, to determine the statute's "broad pre-emptive purpose." *Id.* at 383. For support, the Court relied on its identical analysis of the phrase "relates to" contained in the Employee Retirement Income Security Act of 1974 ("ERISA"), where the Court similarly found state law preempted by ERISA "'if it has a connection with, or reference to, such a plan.'" *Id.* at 384 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983)). Ultimately, because the language of the ADA and ERISA were identical, the Court thought it "appropriate to adopt the same standard []: State enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted under 49 U.S.C. App. § 1305(a)(1)." *Id.*

---

[1] The ADA, and particularly its preemptive provision, is currently codified at 49 U.S.C. § 41713(b)(1): "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."

1    In *Rowe*, as referenced above, the Court explicitly considered its findings in

2 *Morales* and applied the same reasoning to find that § 14501(c)(1) of the FAAAA preempted two

3 provisions of a Maine tobacco law regulating the delivery of tobacco to customers within the

4 state. 522 U.S. at 367, 370–71. In making the comparison, the Court said: "If federal law pre-

5 empts state efforts to regulate, and consequently to affect, the advertising about carrier rates and

6 services at issue in *Morales*, it must pre-empt Maine's efforts to regulate carrier delivery services

7 themselves." *Id.* at 372.

8    With this backdrop in mind, the court turns to the precise language of 49 U.S.C.

9 § 14501(c)(1) at issue here:

> Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). The next subsection of the statute, § 14501(c)(2)(B), contains an

exception to the preemptive effect of subsection (c)(1): Preemption "does not apply to the

intrastate transportation of household goods." *Id.* § 14501(c)(2)(B). Regarding the meaning of

the phrase "transportation of household goods," in a legislative note made part of the Household

Goods Mover Oversight and Enforcement Reform Act of 2005, Congress specifically noted that

"[t]he provisions of title 49 . . . that relate to the *transportation of household goods* apply only to

a household goods motor carrier (as defined in section 13102 of title 49, United States Code)."

Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA"), Pub. L. No.

109–59, § 4202(c), 119 Stat. 1144 (2005) (emphasis added).

   As Congress directs, the court looks next to § 13102 to define the term "household

goods motor carrier." Section 13102(12)(A) lists several services that bring a motor carrier

within the statutory definition; however, subsection (C) provides a "limited service exclusion."

49 U.S.C. § 13102(12)(C). Specifically, subsection (C) states: "The term [household goods

motor carrier] does not include a motor carrier when the motor carrier provides transportation of

household goods in containers or trailers that are entirely loaded and unloaded by an individual (other than an employee or agent of the motor carrier)." *Id.* § 13102(12)(C).

Here, the parties agree defendant does not fall within the statutory definition of "household goods motor carrier" because § 13102(12)(C)'s exclusion applies. Opp'n at 1 ("Plaintiff agrees with PODS that PODS transports household goods, but is not 'a household goods motor carrier (as defined in section 13102)'") (emphasis in original); Reply at 1 ("Plaintiff agrees that PODS is not a 'household goods motor carrier' as defined by federal law"). They disagree, however, as to how this conclusion affects § 14501(c)(1)'s preemptive force. *See generally* Opp'n; Reply.

C.  Statutory Analysis

Plaintiff's argument essentially is this: Defendant is not a "household goods motor carrier" as narrowly defined by § 13102, and title 49, comprising the transportation provisions of the United States Code, more broadly applies only to "household goods motor carrier[s]"; therefore title 49, and all of its provisions, are inapplicable to this case. Opp'n at 2. To reach this conclusion, plaintiff interprets the legislative note in the Household Goods Mover Oversight and Enforcement Reform Act of 2005, stating "provisions of title 49 . . . that relate to the transportation of household goods ***apply only to*** a household goods motor carrier," to mean that only "household goods motor carrier[s]" fall under title 49's provisions. *Id.* (emphasis in original) (citing Pub. L. No. 109–59, § 4202(c), 119 Stat. 1144 (2005)). Additionally, plaintiff cites to the Senate report on the law from the Committee on Commerce, Science, and Transportation for the notion that Congress intended to bolster consumer protection by exempting "certain carrier operations . . . from preemption provisions, such as intrastate transportation of household goods." *Id.* at 3 (citing S. Rep. No. 109-120, at 29 (2005)).

Defendant argues that because the parties agree defendant is not a "household goods motor carrier" under § 13102, the preemption exception under § 14501(c)(2)(B) cannot apply. Reply at 2. Defendant asserts that if plaintiff's interpretation is correct, title 49 would apply only to a "household goods motor carrier," and other provisions under title 49 would be rendered superfluous, e.g., provisions related to carriers of property and persons, freight

8

forwarders and brokers. *Id.* Finally, assuming the applicability of § 14501(c)(1), defendant argues the California laws asserted in plaintiff's four causes of action are preempted by § 14501(c)(1) because they "directly impact the rates that PODS can charge and the services it provides to transport containers," and "[s]uch state laws pose the precise constraint on a federal motor carrier's 'rate, route or service' that the FAAAA preempts." MSJ at 11.

The court finds defendant's arguments persuasive, and plaintiff's claims subject to federal preemption under 49 U.S.C. § 14501(c)(1). While starting with the text of the statute and reading it for its plain meaning wherever possible, the court evaluates the statutory text with the understanding that Congressional intent "is the ultimate touchstone of pre-emption analysis." *United Airlines*, 813 F.3d at 724.

Section 14501(c)(2)(B) exempts preemption for "the intrastate transportation of household goods." Two of the many definitions within the statute have the potential to inform the meaning of this language: subsection (10),[2] which defines the term "household goods," and subsection (12),[3] which defines "household goods motor carrier." 49 U.S.C. § 13102(10), (12).

---

[2] Section 13102(10) provides:

> "The term 'household goods', as used in connection with transportation, means personal effects and property used or to be used in a dwelling, when a part of the equipment or supply of such dwelling, and similar property if the transportation of such effects or property is--
>
> (A) arranged and paid for by the householder, except such term does not include property moving from a factory or store, other than property that the householder has purchased with the intent to use in his or her dwelling and is transported at the request of, and the transportation charges are paid to the carrier by, the householder; or
>
> (B) arranged and paid for by another party.

[3] Section 13102(12) provides:

> (A) In general.--The term "household goods motor carrier" means a motor carrier that, in the ordinary course of its business of providing transportation of household goods, offers some or all of the following additional services:
>
> (i) Binding and nonbinding estimates.
>
> (ii) Inventorying.

9

These definitions appear at first to bring defendant within their scope; however, subsection (12)(C) contains a "limited services exclusion" that excepts motor carriers from the definition of "household goods motor carrier" if they "provide[] transportation of household goods in containers or trailers that are entirely loaded and unloaded by an individual (other than an employee or agent of the motor carrier)." *Id.* § 13102(12)(C). The question thus becomes: When analyzing the phrase "intrastate transportation of household goods," which definition applies?

To answer this question, the parties agree that the legislative note contained in the Household Goods Mover Oversight and Enforcement Reform Act of 2005, which states that "[t]he provisions of title 49 . . . that relate to the transportation of household goods apply only to a household goods motor carrier (as defined in section 13102 of title 49, United States Code)," tells the court how to properly read the statute. MSJ at 8; Reply at 1–2; *see also* Opp'n ("As argued by both Plaintiff herein, and PODS in its Motion . . . [citing Pub. L. No. 109–59, § 4202(c), 119 Stat. 1144 (2005)]"). In support of its position, defendant cites to the Sixth Circuit case *Osman v. Int'l Freight Logistics, Ltd.*, 405 F. App'x 991, 994–95 (6th Cir. 2011), which specifically considered what weight should be given to the legislative note. The *Osman* court reasoned, "[T]he provision, though called a legislative note by the codifiers, was enacted by Congress and is entitled to the same weight as any other law, regardless of whether it was codified in the United States Code." *Id.* (citing *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1251 (11th Cir. 2005) ("That the [Torture Victim Protection Act], which was published in the Statutes at Large, appears

---

> (iii) Protective packing and unpacking of individual items at personal residences.
>
> (iv) Loading and unloading at personal residences.
>
> (B) Inclusion.--The term includes any person that is considered to be a household goods motor carrier under regulations, determinations, and decisions of the Federal Motor Carrier Safety Administration that are in effect on the date of enactment of the Household Goods Mover Oversight Enforcement and Reform Act of 2005.
>
> (C) Limited service exclusion.--The term does not include a motor carrier when the motor carrier provides transportation of household goods in containers or trailers that are entirely loaded and unloaded by an individual (other than an employee or agent of the motor carrier).

in the United States Code as a historical and statutory note to the Alien Tort Act does not make the TVPA any less the law of the land.") (alteration in original)).  Given the parties' agreement and the Sixth Circuit's reasoning in *Osman*, the court finds the legislative note in the Act instructive, at least, of how Congress intends courts to read the term "transportation of household goods."  *See Mackey v. Miller*, 126 F. 161, 162 (9th Cir. 1903) (using legislative margin note to interpret statute); *see also Motorola, Inc. v. United States*, 729 F.2d 765, 771 (Fed. Cir. 1984) ("Although margin notes are generally not used in interpreting statutes, they may be referred to as indicating the intention of Congress.").

With this in mind, when Congress says, "[t]he provisions of title 49 . . . that relate to the transportation of household goods apply only to a household goods motor carrier (as defined in section 13102 of title 49, United States Code)," the court finds, as the Sixth Circuit did, that Congress provided an "unambiguous directive that provisions relating to the transportation of household goods apply *only* to carriers meeting the definition of a household goods motor carrier set forth in 49 U.S.C. § 13102(12)." *Osman*, 405 F. App'x at 995 (emphasis in original). Therefore, when determining whether the preemption exception under § 14501(c)(2)(B) applies to defendant, the court asks whether defendant satisfies the definition of "household goods motor carrier" as defined in § 13102.  Although at first blush the definition appears to apply, *see* 49 U.S.C. § 13102(12)(A) (listing general services to satisfy definition of "household goods motor carrier"), defendant falls under the exception in § 13102(12)(C), which specifically excludes providers when the containers "are entirely loaded and unloaded by an individual (other than an employee or agent of the motor carrier)." *Id.* § 13102(12)(C); *see* Opp'n at 1 ("PODS is not a 'household goods motor carrier as defined in section 13102."); Reply at 1 ("Plaintiff agrees that PODS is not a 'household goods motor carrier' as defined by federal law.").  Therefore, as the parties agree, defendant is not a "household goods motor carrier" under § 13102.  It follows, then, that defendant also cannot satisfy the exception to preemption under § 14501(c)(2)(B).  If § 14501(c)(2)(B) does not apply, then § 14501(c)(1)'s broader preemptive provision may have force as a basis for preemption.

The court is not persuaded by plaintiff's argument that the broader provisions of title 49 cannot apply because defendant is not a "household goods motor carrier." The preemptive reach of § 14501(c)(1) is significant, applying not only to motor carriers, but also to "motor private carrier[s], broker[s], or freight forwarder[s] with respect to the transportation of property." Congress makes no mention of the terms "household goods" or "household goods motor carrier" in this provision. Rather, these terms are given specific treatment and have specific meanings best understood within the overarching framework of the statute. *See, e.g.*, 49 U.S.C. §§ 13102(10), (12)(A)–(B), 14501(c)(2)(B). The Household Goods Mover Oversight and Enforcement Reform Act of 2005 provides direction for the treatment of certain provisions related to the transportation of household goods. Pub. L. No. 109–59, § 4202(c), 119 Stat. 1144 (2005). If any of those provisions do not satisfy the definition of "household goods motor carrier" under § 13102, then the broader meaning of "transportation of household goods" under § 14501(c)(2)(B) cannot apply. It is a strained reading of the legislative note and the statute at large, and a reading the court does not embrace, to suggest that if the meaning of "household goods motor carrier" is not satisfied, then all provisions of title 49 do not apply. *See* Opp'n at 2.

Where a statute's language is clear on its face, *Pac. Mar. Ass'n v. Local 63, Int'l Longshoremen's & Warehousemen's Union*, 198 F.3d 1078, 1081 (9th Cir. 1999), and that meaning is confirmed through expressions of Congressional purpose, *United States v. Buckland*, 289 F.3d 558, 565 (9th Cir. 2002), the court's inquiry ends. The court finds the language of § 14501(c)(1) is clear, as are the attendant definitions in § 13102, are clear, and that clarity is confirmed through Congressional intent as set forth in Pub. L. No. 109–59, § 4202(c), 119 Stat. 1144 (2005) (the SAFETEA).

D.   <u>Preemption Analysis</u>

Given the applicability of § 14501(c)(1), the court considers its effect here. Defendant argues plaintiff's three claims brought under California Business and Professions Code section 17200 and fourth claim under California Civil Code section 1750 are preempted by federal law because they "pose the precise constraint on a federal motor carrier's 'rate, route or service' that the FAAAA preempts." MSJ at 11. Specifically, defendant asserts that all four

12

causes of action are based on defendant's alleged failure to obtain a permit under California's "Household Goods Carriers Act," Cal. Pub. Util. Code § 5101, *et seq.*,[4] which requires carriers to obtain a permit when charging more than $100 for delivery and return of storage containers. *Id.* at 10 (citing Compl. ¶¶ 2–9, 19, 36–37, 41–42, 46–47, 54, 57). Defendant argues the various provisions of state law relied on by plaintiff "dictate a specific dollar amount cap on the transportation services PODS provides," which has a significant impact on the "rate, route or service" preempted by the FAAAA. *Id.* at 11. Plaintiff does not respond to these arguments. *See generally* Opp'n (arguing 49 U.S.C. § 14501(c)(1) does not apply but failing to address defendant's arguments regarding each cause of action if § 14501(c)(1) were to apply).

Given plaintiff's effective concession and the Supreme Court's guidance in *Morales* and *Rowe*, the court finds that § 14501(c)(1) of the FAAAA preempts the provisions of state law on which plaintiff's four claims rely, because they "relate[] to a price, route, or service" provided by defendant. As the Court explained in *Morales*, the ADA's use of the phrase "relating to" signals the provision's "broad scope" and Congress's intent that it be "deliberately expansive." 504 U.S. at 383–84. Similarly, the FAAAA uses this language when speaking of any state law "related to a price, route, or service." 49 U.S.C. § 14501(c)(1). Thus, any state law "having a connection with or reference to" a price, route or service provided by defendant is preempted under 49 U.S.C. § 14501(c)(1). *Morales*, 504 U.S. at 384.

As defendant asserts, there are two specific California laws that underlie plaintiff's four claims: Business and Professions Code section 21701.1 and Public Utilities Code section 5133(b).[5] *See* MSJ at 10. Under Business and Professions Code section 21701.1(a)(1), if any owner or operator of a self-service storage facility or a household goods carrier transports a

---

[4] As noted in defendant's motion, MSJ at 10, the complaint cites to California Public Utilities Code section 5101, *et seq.*, referred to as the Household Goods Carriers Act, regarding California's permitting requirements for transportation of personal household goods over public highways. Compl. ¶ 2. This provision of the Utilities Code, however, was repealed as of January 1, 2019, and recodified as California Business and Professions Code sections 19225, *et seq.*, known as the Household Movers Act. For continuity, the court cites to the Public Utilities Code, as the parties do, and cross references the amended code where appropriate.

[5] Now California Business and Professions Code section 19237.

13

storage container for an amount greater than $100, then that person becomes subject to the permitting requirements under Public Utilities Code section 5101.[6] Defendant charged plaintiff an amount greater than $100 for the container transportation services rendered to her, SF Nos. 23–25, 27, and defendant has not received a permit under Utilities Code section 5101, SF No. 4; therefore, plaintiff alleges this violation forms the basis of each of her claims, Compl. ¶¶ 2–9, 19, 36–37, 41–42, 46–47, 54, 57. Given the broad sweep of 49 U.S.C. § 14501(c)(1), there is a direct relationship between these California provisions and the federal statute because the California provisions target defendant's pricing scheme. Under California law, if defendant chooses to avoid licensure, then it must cap its transportation services at $100; but if defendant chooses to impose higher rates on its customers, then it must undergo the time and expense to obtain a license through the state. The actual cost to defendant of obtaining a license, and the effect of that cost on defendant's profits, do not require the court's attention; rather, the court's only task is to determine whether the California laws invoked by plaintiff "relate to a price, route, or service" provided by defendant. They do. Therefore, the components of California law on which plaintiff's four claims rely, that relate to a price, route, or service provided by defendant, as relevant to this action, are preempted by 49 U.S.C. § 14501(c)(1) of the FAAAA.

Summary judgment is entered in defendant's favor as to the "transportation fees" component of the complaint. As counsel noted at the May 17, 2019 motion hearing, the practical effect of granting summary judgment here is that the case will proceed on the "container-only option" component of the complaint.

/////
/////
/////
/////
/////
/////

---

[6] Now California Business and Professions Code section 19225.

IV.     CONCLUSION

For the reasons set forth above, defendant's motion for partial summary judgment, ECF No. 11, is GRANTED.  The parties shall file a joint status report, prepared following meeting and conferring, within fourteen (14) days of this order advising the court of the parties' positions regarding scheduling going forward.

IT IS SO ORDERED.

DATED: July 20, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE